IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CRAIG HENDRICKS,                          )
                                          )
                        Petitioner,       )
                                          )
vs.                                       )        Criminal No. 2004-05
                                          )        Civil No. 2010-11
UNITED STATES OF AMERICA,                 )
                                          )
                        Respondent.       )
_____ )

## REPORT AND RECOMMENDATION

Before the Court is petitioner Craig Hendricks's Motion to Vacate, Set Aside or Correct

Sentence [DE 1237] pursuant to 28 U.S.C. § 2255.  The government filed a response[1] to which

petitioner replied.  [DEs 1280, 1295].  The motion has been referred to the undersigned for a

Report and Recommendation.  [DE 1351].

## I.    BACKGROUND

As the parties are familiar with the underlying facts of this case, only those facts relevant

to this discussion will be recited.  This matter arises out of a large narcotics-trafficking

organization lead by petitioner and numerous co-defendants.  In April 2003, a grand jury

returned a twelve-count indictment against petitioner.  In August 2005, a jury convicted

petitioner of three conspiracy counts (to import drugs, to distribute drugs, and to launder money),

one count of narcotics possession and distribution, and three additional counts of narcotics

---

[1]     With the exception of citations to law governing criminal proceedings generally, the government's response
was unhelpful in resolving this motion as it contains no legal authority whatsoever in support of its position.  *See*
FED. R. CIV. P. 11 ("By presenting to the court a pleading, written motion, or other paper – whether by signing,
filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's
knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the factual
contentions have evidentiary support . . . the denials of factual contentions are warranted on the evidence or, if
specifically so identified, are reasonably based on belief or a lack of information.").

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 2

possession and distribution.[2]

In June 2007, the District Court sentenced petitioner to a term of 40 years and a supervised release term of 10 years. *See* Judgment and Commitment [DE 1131]; Judgment [DE 1179-1 at 2]. Petitioner appealed his conviction, arguing (1) insufficient evidence to support his money laundering conviction; (2) denial of access to counsel because he was held in Puerto Rico during the trial; and (3) the District Court erred in admitting statements of the government's confidential informant. *United States v. Fleming*, 287 Fed. Appx. 150, 152 (3d Cir. 2008).[3]

The Third Circuit Court of Appeals rejected petitioner's arguments and affirmed his conviction in a judgment issued on August 15, 2008. *Id.*; [DE 1179]. Petitioner's conviction became final on January 12, 2009 – the date the United States Supreme Court denied certiorari review.[4] *Hendricks v. United States*, 555 U.S. 1125, 2009 U.S. LEXIS 244 (2009). The instant petition, filed January 11, 2010, is thus timely.[5]

---

[2]    Petitioner's trial began on July 12, 2005 and concluded on August 4, 2005. [DEs 703, 779].

[3]    The Third Circuit consolidated the appeals of Hendricks and two co-defendants, Daniel Fleming and Russell Robinson. *See Fleming*, 287 Fed. Appx. at 152.

[4]    The Antiterrorism and Effective Death Penalty Act of 1996 establishes a one-year statute of limitations period for section 2255 motions, "running from the latest of" four specified dates. 28 U.S.C. § 2255(f). As in most section 2255 cases, here, the relevant date is "the date on which the judgment of conviction becomes final." *Id.* Where a defendant seeks certiorari review, finality attaches when the Supreme Court denies the petition. *Clay v. United States*, 537 U.S. 522, 527 (2003).

[5]    Under the "prison mailbox rule," a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing. *Houston v. Lack*, 487 U.S. 266, 275-76 (1988); *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998); *Irizarry v. United States*, 2012 U.S. Dist. LEXIS 161744, at *7 (E.D. Pa. Nov. 9, 2012). While the instant motion was docketed on February 17, 2010, petitioner properly certified therein that he placed the motion in the prison mailing system on January 11, 2010. *See* Rule 3(d), Rules Governing § 2255 Proceedings (explaining "timely filing may be shown by [*inter alia*] a declaration in compliance with 28 U.S.C. § 1746 . . ., which must set forth the date of deposit and state that first-class postage has been prepaid") (alteration added); FED. R. APP. P. 4(c)(1) (same).

Hendricks v. USA
Criminal No. 2004-05
Civil No. 2010-11
Page 3

Petitioner raises seven grounds for post-conviction relief, each asserted under the theory of ineffective assistance of trial counsel.[6]

## II.    LEGAL STANDARDS

### A.    28 U.S.C. § 2255

"Motions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution." *Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). Section 2255 allows petitioners to collaterally attack their sentences by moving "the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The remedy is intended only where "the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974) (internal quotation marks omitted); *see also United States v. Addonizio*, 442 U.S. 178, 184 (1979) (explaining "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment"). A section 2255 evidentiary hearing is required unless "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *accord United States v. Padilla-Castro*, 426 Fed. Appx. 60, 63 (3d Cir. 2011).

In order to prevail on a section 2255 motion, a petitioner must show one of the following: (1) the sentence was imposed in violation of the Constitution or the laws of the United States; (2)

---

[6]    Joseph Mingolla, Esq. represented petitioner at the time of his arrest. *See* Suppression Tr. at 28:3-9 (petitioner testified that he "did not . . . choose who [he] wanted as [his] attorney" because federal agents "had it arranged to get in touch with [Attorney Mingolla]" at the time of petitioner's arrest). On June 25, 2003, the Court appointed Andrew Capdeville, Esq. to represent petitioner. [DE 204]. On September 20, 2005, petitioner requested new counsel. [DE 820]. On March 20, 2006, the District Court relieved Attorney Capdeville of his representation obligations. [DE 959]. On March 28, 2006, the District Court appointed Martial Webster, Esq. to represent petitioner during sentencing and on post-trial motions. [DE 963]. On May 2, 2007, petitioner requested new counsel. [DE 1111]. On May 4, 2007, the District Court appointed John Benham, Esq. to represent petitioner for purposes of sentencing. [DE 1112].

the court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). If the court finds any of these grounds, the court must vacate the judgment, resentence the prisoner, or grant the prisoner a new trial as appropriate. *Id.* § 2255(b).

A section 2255 petition is not a substitute for an appeal. *Hodge v. U.S.*, 554 F.3d 372, 379 (3d Cir. 2009). Thus, the general rule is that a petitioner procedurally defaults on a claim if he "neglected to raise [it] on direct appeal." *Id.* (citation omitted); *Massaro v. United States*, 538 U.S. 500, 504 (2003).[7] Moreover, a 2255 petition may not "be used to relitigate matters decided adversely on appeal." *Gov't of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1074-75 (3d Cir. 1985) (citation omitted). Because petitioner is proceeding *pro se*, the Court must construe his motion liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**B.    Ineffective Assistance of Counsel**

In order to succeed on an ineffective assistance of trial counsel claim, a petitioner must show (1) counsel's representation was deficient and (2) the deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).[8] Regarding the "deficient" prong, a petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct. *Id.* at

---

[7]    A petitioner properly raises ineffective assistance of counsel arguments under section 2255 rather than on direct appeal. *See Massaro*, 538 U.S. at 504 (explaining it is "preferable" that such claims be considered on collateral review where the record for such claims may be properly developed); *accord United States v. Garcia*, 516 Fed. Appx. 149 (3d Cir. 2013) ("It is well-settled that this Court ordinarily does not review claims of ineffective assistance of counsel on direct appeal.") (citing *United States v. Thornton*, 327 F.3d 268, 271 (3d Cir. 2003)).

[8]    A court has discretion to dispose of a claim at either prong, as there is no required order to the *Strickland* inquiry. *Strickland*, 466 U.S. at 697 (explaining a court need not "determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies" or "address both components of the inquiry if the defendant makes an insufficient showing on one"). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

688-89 ("the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances"); *accord Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 688. As for the prejudice prong, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

The petitioner bears the burden of establishing his ineffective assistance of counsel claim by a preponderance of the evidence. *United States v. Serrano*, 798 F. Supp. 2d 634, 641 (E.D. Pa. 2011) (citing *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)). Judicial scrutiny of counsel's performance is highly deferential and a petitioner must overcome a "strong presumption" that counsel's strategy and tactics "fall[] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (alteration added). Accordingly, "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) (alteration added).

## III.    DISCUSSION

### A.  Trial counsel's ineffective representation during the plea process (Grounds One & Two)

In ground one, petitioner argues that trial counsel rendered ineffective assistance by failing to advise as to the strength of the government's case. Pl.'s Mot. at 20. In ground two, petitioner avers that trial counsel failed to inform petitioner of his sentencing exposure under the U.S. Sentencing Guidelines ("the Guidelines"). Pl.'s Mot. at 24. In particular, argues petitioner, trial counsel failed to (1) advise "that any uncharged portion of the alleged drug quantities" could be used to calculate petitioner's sentence; and (2) provide an explanation as to sentencing

enhancements for "being a pilot" and his "leadership role" in the offense.  *Id*.  Petitioner claims these alleged failures persuaded him to reject a plea offer and proceed to trial, resulting in a higher sentence.

The government includes an affidavit from Attorney Capdeville in support of its position that petitioner received effective assistance of counsel during the plea process.  Attorney Capdeville's affidavit includes the following averments: (1) he "fully informed Mr. Hendricks of all of the evidence against him and discussed the *possibility of a plea*;"[9] (2) petitioner terminated his cooperation with the government and chose to go to trial despite counsel's warning "of the probable consequence of a conviction if we went to trial;" (3) petitioner told him "never again to brooch [sic] the subject of plea bargaining;" and (4) he informed petitioner of a possible life sentence and that petitioner "could be liable for all of the drug[s] alleged in the conspiracy as well as his leadership role in the conspiracy."  Capdeville Aff. ¶¶ 5-7 [DE 1280-1] (emphasis added).  Petitioner's reply includes an unsigned and unsworn affidavit essentially contradicting Attorney Capdeville's averments.  [DE 1295-1].

While there is no constitutional right to a plea bargain,[10] the Sixth Amendment right to effective assistance of counsel extends to assistance rendered when deciding whether to reject a plea offer.  *Missouri v. Frye*, 132 S.Ct. 1399, 1409-10 (2012) and *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012);[11] *see United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992) ("[A] defendant

---

[9]      Neither party definitely states a plea offer was actually presented to petitioner.  Petitioner claims only that had counsel explained "the extent of the government's case, there is more than a reasonably probability that Petitioner . . . would have reached an agreement with the government to resolve the charges."  Pet'r's Mem. at 22.  The government argues in a conclusory manner that petitioner was "fully informed [] of all of the evidence against him and his co-defendants."  Def.'s Resp. at 5.

[10]      *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977).

[11]      In *Frye*, counsel failed to inform the defendant of a favorable plea offer, which subsequently lapsed,

has the right to make a reasonably informed decision whether to accept a plea offer.").  Effective assistance includes "communicat[ing] . . . the terms of the plea offer, and . . . inform[ing] the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (internal citations omitted).  "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43.  "In order to provide this necessary advice, counsel is required to know the Guidelines and the relevant Circuit precedent . . . ." *United States v. Dung Bui*, __ F.3d __, 2015 U.S. App. LEXIS 13548, at *8 (3d Cir. Aug. 4, 2015).

The same two-part analysis set forth in *Strickland* applies to alleged ineffective assistance of counsel during the plea bargaining process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).  While the deficient performance prong remains the same, under the prejudice prong, the petitioner "must show the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384.  If a defendant rejects a plea, he must show that but for counsel's deficient performance (1) "there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances);" (2) "the court would have accepted its terms;" and (3) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."[12]  *Id*. at 1385.

---

resulting in the defendant ultimately accepting a less favorable plea deal. In *Lafler*, counsel's incorrect advice resulted in the defendant rejecting a favorable plea offer, which led to a conviction following trial and a significantly higher sentence than had been offered in the rejected plea.

[12]      "Although the Court of Appeals for the Third Circuit has not definitively addressed the issue, other courts of appeals have held that requiring the government to reinstate a prior plea offer is the appropriate remedy." *Williams v. United States*, 2014 U.S. Dist. LEXIS 112624, at *55 (W.D. Pa. Aug. 14, 2014) (collecting cases).

Petitioner's opening memorandum in support of his motion does not identify the attorney against whom grounds one and two are directed.  The context of the statements made therein, however, suggests that petitioner faults Attorney Mingolla only.  *See* Pet'r's Mem. at 20-21. First, petitioner relies on his Motion Seeking Relief from a 5th and 6th Amendment Violation by the Court and Prosecutors of the Government (denied by the District Court) wherein he accused Attorney Mingolla of "l[ying] to defendant and defendant's family in order to obtain properties from defendant's home . . . ."  Pet'r's Mem. at 20; [DE 942].  Also, petitioner relies on Attorney Mingolla's appearance as a government witness at the March 30, 2006 suppression hearing. Pet'r's Mem. at 21 (stating "as this court is aware . . . [Attorney Mingolla] explicitly advised AUSA Sluzbach that he was aware that the case against his client was 'very strong,' however [Attorney Mingolla] failed to advise the same to [p]etitioner").  *Id.*

In his reply, however, petitioner faults Attorney Capdeville for committing the same failings allegedly committed by Mingolla.  Faced with the conflicting affidavits of petitioner and Attorney Capdeville, argues petitioner, the Court must hold an evidentiary hearing.  Evidentiary hearings are particularly appropriate when "claims raise facts which occurred out of the courtroom and off the record."  *United States v. Burrows*, 872 F.2d 915, 917 (9th Cir. 1989).  As explained below, however, the record conclusively indicates that Mingolla advised petitioner of the evidence against him and a possible life sentence long before Attorney Capdeville represented petitioner.  Moreover, as explained further, even if both Attorney Mingolla and Attorney Capdeville provided deficient performance, petitioner is unable to show the requisite prejudice.

1.    Strength of the Evidence (Ground One)

Plaintiff claims that because counsel failed to properly advise as to the weight of the

evidence against defendant and the Guidelines, petitioner made "an uninformed decision" to withdraw a signed "cooperation agreement."  Pet'r's Mem. at 21, 26.  But for this alleged error, claims petitioner, "there is [a] reasonable and extensive possibility that [he] would not have proceeded to trial and would have mitigated his overall term of incarceration."  *Id*. at 23.

Petitioner's claim that counsel failed to advise as to the extent of the government's evidence in this matter is belied by the record.  In a colloquy between Attorney Capdeville and petitioner during the March 2004 suppression hearing, petitioner acknowledged Attorney Mingolla's warnings regarding the evidence against petitioner:

Q.    Did Mr. Mingolla say to you it's okay to answer the questions?

A.    He said I had better do what they want me to do because they say they have a lot of evidence against me.

. . .

A.    In fact, you had another lawyer by the name of Alan Feierstien [sic], correct?

A.    I'm not sure how you would say he represented me.

Q.    He was present at some point after your arrest?

A.    He was – he was never with me at any point.  He was over in St. Thomas.

Q.    Did you talk with him on the telephone?

A.    Just by telephone.

Q.    Did he tell you anything?

A.    He said he listened to some information that the agents gave to him over there.  I don't know what evidence was given to him.

Q.    Did he give you any advice?

A.    He said, based on what they've been telling him, it's probably best that I do

what they want me to do.[13]

Also, during a colloquy between Assistant United States Attorney Patricia Sulzbach and petitioner, petitioner again acknowledged that he had been warned about the evidence against him:

> Q.    Basically, you were facing a conviction?
>
> A.    Life, is what he [Attorney Mingolla] was more [sic] saying.
>
> Q.    Okay.  And then you got to speak with an attorney named Alan Feuerstein that same Saturday, correct?
>
> A.    I've never met Alan Feuerstein.  I do not know his voice.  But I spoke to someone who said that was his name.
>
> Q.    Okay.  And Mr. Feuerstein spoke to you because Joe Mingolla asked him to get involved in this case, right?
>
> A.    Correct.
>
> Q.    Okay.  And Mr. Feuerstein had a conversation with you on the phone, right?
>
> A.    Correct.
>
> Q.    And in that conversation, he also told you that the government has a lot of evidence and that you should cooperate, right?
>
> A.    He said, based on the evidence that he's seeing and hearing at that point, it doesn't look good.[14]

Finally, a colloquy between Assistant United States Attorney Patricia Sulzbach and Attorney Mingolla corroborates petitioner's suppression hearing testimony:[15]

---

[13]    Mar. 26, 2004 Suppression Hr'g Tr. at 29, 37 [DE 1160].

[14]    Mar. 30, 2004 Suppression Hr'g Tr. at 32:23-25, 33:1-15 [DE 1155].

[15]    Attorney Mingolla testified as a government witness pursuant to a subpoena.  May 10, 2004 Hr'g Tr. at 17 [DE 512].

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 11

> Q.    The agents told you that some of the evidence against your client, Craig Hendricks, included a wiretap, right?
>
> A.    Yes.
>
> Q.    And did they tell you that the case against your client was very strong?
>
> A.    Yes.
>
> Q.    And there was some discussion as to the type and nature of evidence against your client, right?
>
> A.    Yes, yeah, there was.[16]

Based on the above, petitioner's first claim of ineffective assistance by counsel is unsupported by any showing of deficient performance.

2.    <u>Relevant Conduct and Potential Sentencing Exposure (Ground Two)</u>

The Court assumes *arguendo* that counsel failed to advise petitioner regarding the impact of relevant conduct on his potential sentence, as the record evidence is limited to competing affidavits.  Nevertheless, petitioner proffers no evidence to support a finding as to any of the *Lafler* factors and in particular, evidence of his serious consideration of a plea offer.  First, the record does not demonstrate that there is a reasonable probability that petitioner would have accepted a plea offer.  In fact, the record supports the opposite conclusion.  During his suppression hearing, petitioner testified that he signed a "cooperation agreement" (which he later withdrew) only because federal agents threatened to "arrest [his] mother and [his] wife, and take [his] child for the second time" if he refused.[17]  Petitioner testified further that the "cooperation agreement" was based on evidence that was

---

[16]    *Id.* at 20 [DE 512].

[17]    Mar. 30, 2004 Suppression Hr'g Tr. at 30 [DE 1160]; *see also* Mar. 26, 2004 Suppression Hr'g Tr. at 35 [DE 1155].

> all false . . . they [i.e., federal agents] were trying to make - - conversations that they were playing for me saying that these were drug conversations.  They had no - - they said nothing about any drugs there on that but they had someone who was going to come and state that this conversation was drugs.[18]

Finally, petitioner maintained his innocence at sentencing:

> MR. BENHAM:  These are not the actions of a depraved criminal, Your Honor.  These are the actions of a person who, though he stands convicted of these crimes, he *maintains his innocence on these crimes.*
>
> . . .
>
> THE  COURT  [addressing  petitioner]:   I  won't  ask  you  anything  about  the underlying offense, *because you have maintained your innocence*, and that's appropriate.[19]

*See Dewulf v. McKee*, 2015 U.S. Dist. LEXIS 31510, at *38 ( E.D. Mich. Mar. 16, 2015) ("When determining the remedy for ineffective assistance of counsel relating to defendant's rejection of a plea offer, a court may take account of a defendant's earlier expressed . . . unwillingness[] to accept responsibility for his . . . actions.") (citing *Lafler*, 132 S.Ct. at 1385).  Finally, petitioner proffers no evidence that the District Court would have accepted a plea agreement or that his sentence thereunder would have been less severe than the sentence actually imposed.  Under these circumstances, petitioner has failed to show both deficient performance and prejudice, and his second ineffective assistance argument also fails.  *See Strickland*, 466 U.S. at 687.

Accordingly, this Court RECOMMENDS that petitioner's first two claims of ineffective assistance of counsel be DENIED.

## B.  Trial counsel's failure to assert prosecutorial misconduct (Grounds Three & Five)

Two of petitioner's allegations of ineffective of assistance of counsel relate to counsel's

---

[18]    Mar. 26, 2004 Suppression Hr'g Tr. at 37-38.

[19]    Sentencing Tr. at 43:3-6, 46:11-13 [DE 1135] (emphasis added).

failure to claim prosecutorial misconduct.  For ground three, petitioner argues the government submitted a "broaden[ed]" version of the superseding indictment to the jury so that its cooperating witness, Ishmael Brathwaite, could "falsely testify" about his participation in "several drug runs" with petitioner.  As ground five, petitioner asserts that the government suborned perjury by presenting the testimony of witness Arthur Collymore and Agent Jacqueline Reynolds.

"Federal prosecutors have a special and solemn duty to refrain from improper methods of obtaining a conviction."  *United States v. Morena*, 547 F.3d 191, 193 (3d Cir. 2008).  To prove prosecutorial misconduct, a petitioner must show (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct prejudicially affected the petitioner's substantial rights so as to deprive him of a fair trial.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding prosecutorial misconduct is insufficient to overturn a conviction unless it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process"); *accord Lam v. Kelchner*, 304 F.3d 256, 271 (3d Cir. 2002).

"Unfortunately, when a prosecutor acts unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection."  *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005).  "A failure to make such an objection can have devastating consequences for an individual defendant."  *Id.*  Accordingly, "[a] failure to object to prosecutorial misconduct can constitute ineffective assistance of counsel."  *Alexander v. Shannon*, 163 Fed. Appx. 167, 173 (3d Cir. 2006) (citing *Gravley v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996)).

1.      Broadening superseding indictment (Ground Three)

Petitioner argues that the government presented a "broaden[ed]" superseding indictment

to the jury "as the true copy of the charges of the superseding indictment that was handed down by the grand jury" in order "to allow [] Braithwaite . . . to falsely testify."[20]  Pet'r's Mem. at 28. Petitioner essentially argues that the government constructively amended count one of the superseding indictment (conspiracy to distribute cocaine), impermissibly broadening the possible bases for petitioner's conviction in violation of the Grand Jury Clause of the Fifth Amendment.[21] Thus, claims petitioner, Attorney Capdeville rendered ineffective assistance of counsel in failing to object to the use of the amended superseding indictment.

In count one of the superseding indictment, petitioner was charged with conspiring to possess with the intent to distribute cocaine and marijuana under 21 U.S.C. § 846.  The superseding indictment included numerous "overt acts" in furtherance of this conspiracy, including "on or about *December* 2001, **[1] Craig Hendricks** organized the importation of a drug shipment from St. Martin to St. Thomas.  This shipment did arrive in St. Thomas in *December* 2001 and consisted of approximately one hundred (100) kilograms of cocaine."[22]  As evidence in support of this overt act, the government elicited testimony from Brathwaite. Brathwaite testified about his involvement in a "couple, three or four" drug runs with petitioner, with the last drug run occurring "between 2000 and 2001."[23]  Brathwaite testified further that the last drug run with petitioner involved flying to St. Martin, "pick[ing] up some [approximately 150] keys [i.e., kilos of cocaine]," loading the drugs onto a boat, driving the boat to St. Croix and

---

[20]     The government's response is not helpful to the Court's analysis as it fails to address this claim in a meaningful way.

[21]     "A constructive amendment to the indictment constitutes a per se violation of the fifth amendment's grand jury clause." *United States v. Syme*, 276 F.3d 131, 148 (3d Cir. 2002).

[22]     Superseding Indict. Count 1 § III(D) [DE 544 at 5] (italicized emphasis added; bold emphasis in original).

[23]     July 19, 2005 Trial Tr. at 95:20, 96:3-17 [DE 875].

unloading a portion of the drugs, then returning to St. Thomas with the remainder of the drugs.[24]

While the superseding indictment states the St. Martin-St. Thomas drug run occurred in December 2001, neither the government nor defense counsel elicited testimony regarding the date from Braithwaite during his trial testimony. During the final charge, however, the District Court read a redacted copy of the superseding indictment to the jury, which omitted both "December" references indicated above. Petitioner argues the government intentionally omitted the "December" references in light of Brathwaite's testimony that he left St. Thomas in September 2001.[25]

Here, petitioner has not shown – as a result of the redacted superseding indictment – that the jury convicted him for an offense other than the drug conspiracy as charged by the grand jury in the original superseding indictment. *See United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006) (explaining a constructive amendment of an indictment occurs when "jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged"). At best, petitioner has called into question one of the 19 overt acts alleged in the superseding indictment in furtherance of count one. That said, "the [g]overnment is under no obligation to prove every overt act alleged." *United States v. Adamo*, 534 F.2d 31, 38 (3d Cir. 1976) (noting also that "the [g]overnment is not limited in its proof at trial to those overt acts alleged in the indictment").

---

[24]    *Id*. at 99:2-6, 16-17, 100:5-13, 23-25, 101:5-7, 17-20, 102:23-25, 103:2-4, 105:12-14, 106:10-11, 108:9-18, 109:9-11.

[25]    *Id*. at 93:13-14.

The evidence at trial demonstrated numerous other overt acts committed in furtherance of a drug conspiracy and identified in the redacted superceding indictment.[26]  *See United States v. Small*, 472 F.2d 818, 819-20 (3d Cir. 1972) ("Commission of an overt act by one of the conspirators is an essential element of the crime of conspiracy."); 8 U.S.C. § 371 (containing an explicit requirement that a conspirator perform an "act to effect the object of the conspiracy"). This evidence – unchallenged by petitioner – supports the jury's verdict as to count one.  Thus, even if counsel failed to object to the redacted version of the superseding indictment, and such failure constitutes deficient performance, petitioner is unable to establish prejudice.

Accordingly, the Court RECOMMENDS petitioner's third claim of ineffective assistance of counsel be DENIED.

2.   Government's presentation of perjured testimony (Ground Five)

   i.   *Arthur Collymore's testimony*

Petitioner claims the government "forc[ed]" Collymore to testify falsely about his (Collymore's) role regarding a non-disclosure agreement entered into between Collymore and petitioner in direct contradiction to information provided in the superseding indictment.  As such, argues petitioner, Attorney Capdeville – in failing to move for suppression of Collymore's statements or seek dismissal of the charges – rendered ineffective assistance of counsel.

In count twelve of the superseding indictment, petitioner was charged with conspiracy to commit money laundering under 18 U.S.C. § 1956(h).  The superseding indictment included numerous "overt acts" in furtherance of this conspiracy, including

---

[26]   *See, e.g.*, July 18, 2005 Trial Tr. at 54-58, 63-86 (evidence supporting overt acts on or about June 6, 2001), 231-236 (evidence supporting overt acts on or about March 2001) [DE 874]; July 20, 2005 Trial Tr. at 47-59 (evidence supporting overt acts on or about February 7, 2003), 81, 136-138, 146 (evidence supporting overt acts on or about March 1, 2003) [DE 876]; July 22, 2005 Trial Tr. at 94-102 (evidence supporting overt acts on or about October 10, 2002) [DE 878].

> [i]n order to launder some of the illegal drug proceeds of the organization, **[1] Craig Hendricks** and **[4] Daniel Fleming** loaned money to at least one legitimate businessman.  A $25,000 loan was verified by a notarized written agreement dated March 7, 2002.  This loan was described as an investment in the business, and was effected by opening a joint bank account between the businessman and **[4] Daniel Fleming**.  **[1] Craig Hendricks** attempted to conceal his involvement in the transaction *by ordering the businessman to sign a non-disclosure agreement*, and by directing him to coordinate payments with **[4] Daniel Fleming**.

Superseding Indict., Count Twelve § III(G) [DE 544 at 22] (italicized emphasis added; bold emphasis in original).  On direct examination, the government elicited testimony from Collymore regarding the loan from petitioner.  Collymore testified that due to his lack of credit, he was unable to finance the opening and running of a restaurant.[27]  In August 2001, Collymore and petitioner entered into a formal agreement evidencing their business relationship.[28]  Between August 2001 and January 2002, petitioner lent Collymore a total of $25,000.[29]

Collymore further testified that on March 7, 2002, he and petitioner entered into a written agreement, drafted by Collymore, regarding petitioner's collection of the $25,000 loan plus interest.[30]  The agreement, containing notarized signatures of both Collymore and petitioner, included the following non-disclosure clause: "There shall be no physical, verbal or written disclosure of this agreement by either party.  Any breach of the nondisclosure clause will make the contract null and void."[31]  Collymore testified that inclusion of the non-disclosure clause was

---

[27]    July 25, 2005 Trial Tr. at 289:3-14 [DE 879].

[28]    *Id*. at 252:1-24.

[29]    *Id*. at 256:5-10, 259:18-25, 267:7-12, 268:9-14, 269:10-12.

[30]    *Id*. at 271:6-8, 272:1-2, 273:8-17.

[31]    *Id*. at 272:11-15, 273:21-25.

**his** suggestion – not petitioner's as alleged in the superseding indictment.[32]

"The Supreme Court has long held that the [government's] knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment."  *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004) (alteration added; citations omitted).  In order to sustain a claim of constitutional error under such circumstances, a petitioner must show that a witness actually perjured himself, the government knew or should have known of his perjury,[33] the testimony went uncorrected and there is a "reasonable likelihood that the false testimony . . . affected the judgment of the jury."  *Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995); *Lambert*, 387 F.3d at 242.

A witness commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  Accordingly, "testimony offered by a witness that contradicts . . . previous testimony by that witness [] is [generally] insufficient to demonstrate perjury."  *United States v. Edwards*, 2011 U.S. Dist. LEXIS 133405, at *15 (D.V.I. Nov. 18, 2011).  Furthermore, "[t]he mere presence of inconsistent statements [] does not establish that the prosecutor willfully presented perjured testimony."  *United States v. Mershon*, 2010 U.S. Dist. LEXIS 111042, at *21 (E.D. Pa. Oct. 19, 2010) (alterations added).  As recognized by the Third Circuit, "[t]here are many reasons testimony may be inconsistent; perjury is only one possible reason."  *Lambert*, 387 F.3d at 249.

Here, petitioner presents no evidence of perjury, let alone willful intent on the part of Collymore.  Rather, petitioner relies solely on an inconsistency between the superseding

---

[32]    *Id*. at 274:14-20.

[33]    *See Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair.") (alteration added);  *United States v. Biberfeld*, 957 F.2d 98, 102 (3d Cir. 1992) (noting it is fundamentally unfair to an accused "when the government, although not soliciting false evidence, allows [such evidence] to go uncorrected when it appears at trial.") (alteration added; citation omitted).

indictment and Collymore's testimony.   Accordingly, petitioner's ineffective assistance claim regarding Collymore's testimony is deficient on its face.  *See United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) ("Vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.").

Nevertheless, even if Collymore perjured himself and the government knew or should have known of this perjury, petitioner fails to demonstrate that "there is any reasonable likelihood that the false testimony could have affected the verdict."[34]  *Strickland*, 466 U.S. at 695.   The Court's exhaustive review of the trial transcripts indicates that the government presented evidence of petitioner's guilt as to the money laundering count that existed separate and apart from Collymore's testimony such that the jury would not have "had a reasonable doubt respecting guilt."   *Strickland*, 466 U.S. at 695.   This evidence included the following: (1) testimony by Julian Quetel, then part owner of a boat rigging company, that petitioner paid $16,000 in denominations of fives, tens and twenties for the purchase of boat engines and parts;[35] (2) testimony by David Peltier, a charter pilot for petitioner, that petitioner made statements about having to "move millions of dollars" associated with drug runs to St. Martin;[36] (3) petitioner's multiple bank account records at different banks evidencing numerous deposits of less than $10,000 each;[37] and (4) petitioner's Western Union transactions evidencing a total of

---

[34]    Moreover, it is at least arguable that Collymore's testimony was helpful to petitioner's defense, rather than prejudicial, as it directly contradicted a fact alleged by the government.

[35]    July 25, 2005 Trial Tr. at 302:7-14, 303:24-25, 304, 305 [DE 879].

[36]    *Id*. at 17:9-20, 23, 24:4-6, 29:22-24, 95:8-19.

[37]    July 26, 2005 Trial Tr. at 150-59 (testimony by Agent Reynolds) [DE 880].

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 20

$68,000 in wire transfers.[38]

Thus, even if Attorney Capdeville's representation as to the money laundering charge fell below an objective standard of reasonableness based on his treatment of the Collymore testimony, petitioner has not shown the requisite prejudice. *See Gonzalez-Soberal v. United States*, 244 F.3d 273, 278 (1st Cir. 2001) (noting that "a significant factor weighing in favor of finding prejudice is the absence of any corroborating evidence other than the testimony of [the unimpeached witness]").

ii.    *Agent Jacqueline Reynolds's testimony*

Petitioner also claims the government presented false testimony by Agent Reynolds.  In particular, petitioner claims Reynolds falsely testified to

> review[ing] all business records recovered from the search warrant on July 17, 2001 at Petitioner's residence, [and] . . . that for the period from 2000 to December 2002, the records only showed a total income of $45,000.00. However, [Attorney Capdeville] knew and should have raised to the court's attention and/or requested a mistrial based on the perjured testimony since he was aware that that [sic] not all business records of Craig's Marine Service, the business the [petitioner] owned at that time, were not [sic] maintained in his residence when the search was conducted.  For example receipt books for rentals were inside defendant's truck and were not seized during the search.  Those receipts were the ones that were used to claim the $54,000.00 that were seized by the INS during the search that were later returned.  *The prosecutors knew that [A]gent Reynolds could not have reviewed all the documents involved in defendant's case as she testified during the trial.*

Pet'r's Mem. at 36-37 (emphasis added).   Petitioner's argument is meritless.  First, petitioner points to no testimony by Agent Reynolds wherein she claimed to have reviewed "all the documents involved in defendant's case" and the Court has found none.   During direct examination, the government questioned Agent Reynolds about her review of various financial documents retrieved from petitioner's home pursuant to a search warrant.   This line of

---

[38]    *Id*. at 163, 164:1 (testimony by Agent Reynolds).

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 21

questioning included Agent Reynolds's testimony that she reviewed only "some" business

records of Craig's Marine Services: [39]

> Q.    And during the course of your investigation, have you had an opportunity to review banking records that have been obtained in connection with this investigation?
> A.    Yes, I have.[40]
>
> Q.    Now, during the course of your investigation, did you also have occasion to review any documents that were obtained from Mr. Hendricks' residence?
> A.    Yes, I did.
> Q.    And were those documents related – were any of those documents related to any business?
> A.    *There were some business records.*
> Q.    And what was the business that those documents were related to?
> A.    Craig's Marine Service.
> Q.    Did you have occasion to review any invoices or receipts for services provided by Craig's Marine Service for hauling of boats?
> A.    There were a few.
> Q.    And you did find some documents?
> A.    There were, there were a few documents in the search warrant.
> Q.    And do those documents pertain to any particular area?
> A.    They pertain to the hauling of boats performed by Craig's Marine Service.[41]
>
> Q.    And when you reviewed records from the residence, did you review all the documents that were recovered?
> A.    Yes, I did.[42]
>
> Q.    And have you reviewed those documents obtained in the search warrant?
> A.    Yes.
> Q.    And have you looked at those documents and analyzed them?
> A.    Yes.[43]

---

[39]    During trial, the business was sometimes referred to as Craig's Marine Service.

[40]    July 26, 2005 Trial Tr. at 97:19-23 [DE 880].

[41]    *Id.* at 112:21-25, 113 (emphasis added).

[42]    *Id.* at 115:4-6 (emphasis added).

[43]    *Id.* at 126:13-19.

> Q.    Now during the course of your review of the search warrant, did you examine any documents that showed income earned by Mr. Hendricks?
> A.    Yes.
> Q.    And were you able to make a calculation of an approximate amount of that income?
>
> . . .
>
> [A].   From all of the search warrant documents, there was approximately $45,000 in cash – $45,000 that was earned by Mr. Hendricks.
> Q.    And what was the time period of that calculation?
> A.    That would have been from January 2000 to the end of 2002.
> Q.    And can you just briefly describe the documents that supported, what type of documents supported that calculation?
> A.    *They were receipts from the hauling of boats, and then a few receipts from selling boats.*[44]

Petitioner points to no evidence indicating Agent Reynolds, in so testifying, perjured herself.[45]

Moreover, during cross-examination, Attorney Capdeville questioned Agent Reynolds at length regarding her investigation of petitioner's personal and business finances. This questioning included the following colloquy regarding the seizure of $54,000:

> Q.    . . . . You're aware that in the first search of Mr. Hendricks' home, I believe back in 2001, there was a sum of money in the amount of $54,000 that was taken. Do you – did you recall hearing testimony on that?
> A.    That sounds correct.
> Q.    And did you hear Agent Levering testify that that $54,000 was returned to Mr. Hendricks?
> A.    I was not in during Agent Levering's testimony.
> Q.    Well, do you have any independent knowledge that that money was returned to Mr. Hendricks' [sic] in the form of a U.S. Government check?
> A.    I believe so.

---

[44]    *Id*. at 164:3-23 (emphasis added).

[45]    Petitioner also launches the conclusory allegation that "the prosecution knew" Agent Reynolds's testimony "that Petitioner closed an account from Chase Manhattan Bank/First Bank on March 29, 30, 2001 [sic] [and] testifying that Petitioner solely maintained nine different bank accounts" "was untrue." Pet'r's Mem. at 36 (alterations added); *see* Pet'r's Reply at 20; July 26, 2005 Trial Tr. at 166:6-11, 169:13-21 (testimony by Agent Reynolds about the nine bank accounts and closing of the FirstBank account). Petitioner provides no specifics for the Court to meaningfully analyze this allegation. Rather, petitioner appears to rely on the erroneous allegation that Agent Reynolds testified to reviewing all records of Craig's Marine Services. Petitioner's ineffective assistance claim regarding this allegation is deficient on its face. *See Thomas*, 221 F.3d at 437.

Q.     All right.  And do your records indicate into which account that $54,000 went?

A.     I would have to look at the individual accounts.  If I reviewed the accounts, I could tell you if it went in.

Q.     But when you reviewed them in your direct testimony with Attorney Stone, there was no mention of that money, correct?

MS. STONE:  Objection.

THE WITNESS:  There –

MS. STONE:  There's no testimony that we reviewed every transaction on every account.

MR. CAPDEVILLE:  I'm just asking if that was omitted.

THE COURT:  You may – you should – you may ask, assuming that such a check were deposited, it would be reflected as other than cash.

MR. CAPDEVILLE: I'm sorry.  Did you understand what Judge Giles had indicated, in correcting me?

THE WITNESS:   Can you repeat that, please?

MR. CAPDEVILLE:  Could I –

THE COURT:  The question is:  If the government check were deposited into a bank account, would it be reflected as cash deposited, or check?

THE WITNESS:   No, if the government check was deposited, it would have been noted as a check from the government.[46]

On redirect examination, Agent Reynolds clarified that she never saw a copy of a U.S. government check in the amount of $54,000 in the documents maintained at petitioner's home.[47]

---

[46]     July 26, 2005 Trial Tr. at 171:24-25, 172, 173:1-13 [DE 880].

[47]     BY ATTORNEY STONE:

Q.     And additionally, did you review any copies of checks written out at those accounts that were maintained in Mr. Hendricks' records from his house.

A.     Yes, I did.

Q.     And in your review of all those records, did you see either a copy or a – let me ask it this way:  Did you ever see a copy of a U.S. Government check in the amount of $54,000?

Attorney Capdeville also inquired about Agent Reynolds's review of documents regarding Craig's Marine Services:

> Q.    Now, as to the records that you reviewed from Mr. Hendricks' home, there were about what, over 30 files  pertaining to Craig's business service – or Craig's Marine Services?
> A.    No.
> Q.    Less?
> A.    Thirty files?
> Q.    Were there more than 30 files?
>
> MS. STONE:  Objection, your Honor.  Those have been admitted into evidence –
>
> THE COURT: Just a minute.  Overruled.
>
> MR. CAPDEVILLE: Thank you.
>
> THE WITNESS:  I do not have such files.  I have documents – I just have these papers.
>
> BY MR. CAPDEVILLE:
>
> Q.    So you really didn't get the business files that Mr. Hendricks maintained at his residence.
> A.    No.  I have, I reviewed everything that was –
> Q.    Okay.  You didn't get the files.  Now, as to the receipts that you saw regarding Mr. Hendricks' boat hauling services, *it is not your testimony that that, those receipts constitute all the receipts that he has for that service, correct*?
> A.    *Those were the receipts that were obtained from the search warrant*.
> Q.    *That's just what was available?*
> A.    *Yes*.[48]

Finally, Attorney Capdeville attempted – albeit unsuccessfully – to secure testimony from Agent Reynolds that her analysis of petitioner's financial activities was inaccurate due to having an incomplete record:

---

> A.    No, I did not.

*Id*. at 182:15-23.
[48]    *Id*. at 175:10-25, 176:1-12 (emphasis added).

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 25

> Q.      And if you were given incomplete records, would that render your summaries or opinions today as not being accurate?
>
> MS. STONE:  Objection.
>
> THE COURT: Sustained.
>
> BY MR. CAPDEVILLE:
>
> Q.      In a business such as what you understand Craig's Marine Services to be, would you consider it unusual not to have every single record?
>
> MS. STONE:  Objection.
>
> THE COURT: Sustained.
>
> BY MR. CAPDEVILLE:
>
> Q.      Every single record pertaining to cash transactions?
>
> MS. STONE:  Objection.
>
> THE COURT: Sustained.[49]

Given there is no evidence that the government introduced perjured testimony, Attorney Capdeville had no basis on which to object.  Moreover, Attorney Capdeville specifically questioned Agent Reynolds regarding the existence of business records other than those obtained and reviewed pursuant to the search warrant of petitioner's home.  Accordingly, petitioner has failed to show how his trial counsel's representation was deficient as he has identified no acts or omissions that were "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Having found that trial counsel did not act in a professionally deficient manner, the Court need not proceed to an analysis of the second *Strickland* prong.  *See Boyd v. Warden*, 579 F.3d 330, 376 (3d Cir. 2009) ("It is axiomatic that, to succeed on an ineffective assistance of counsel claim, a petitioner must establish both prongs of the test enunciated by the Supreme

---

[49]    *Id*. at 176:25, 177:1-15.

Court in Strickland."); *United States v. Delbuono*, 2011 U.S. Dist. LEXIS 90070, at *10 (E.D. Pa. Aug. 11, 2011) (declining to consider prejudice factor upon finding petitioner failed to satisfy the performance factor).

The Court RECOMMENDS petitioner's fifth claim of ineffective assistance of counsel be DENIED.

## C.    Trial counsel's failure to challenge altered video evidence (Ground Four)

Petitioner claims Attorney Capdeville rendered ineffective assistance when he failed to move for a dismissal upon learning that Joseph Tokarz, Jr., an agent for the Drug Enforcement Agency ("DEA"), altered video evidence in the case.  Pet'r's Mot. at 31.  In particular, petitioner argues that Agent Tokarz altered a videotape dated March 1, 2003, yet testified falsely that he had in fact not altered the video.

On direct examination, Agent Tokarz testified that he began visual surveillance of petitioner's home on the morning of March 1, 2003.[50]  Between 10 a.m. and 11 a.m. that morning, Agent Tokarz left petitioner's home and drove to the East End of St. Thomas.[51]  Once parked at the East End, Agent Tokarz testified to video recording petitioner's speedboat entering a waterway (Current Cut).[52]  During the trial, the government played a copy of the original videotaped recording (labeled as government's exhibit 74).[53]  Prior to the jury viewing the copied recording, Agent Tokarz testified that he had compared the copy to the original and that the copy

---

[50]    July 20, 2005 Trial Tr. at 81:14-15 [DE 876].

[51]    *Id*. at 93:13-17.

[52]    *Id*. at 94:9-23, 115:19-21, 116:12-18.

[53]    *Id*. at 117:2-5 (Agent Tokarz testified that the original videotape "was done with  . . . an 8 millimeter video camera, digital tape . . . .").

was a fair and accurate depiction of what he observed on March 1, 2003.[54]

On cross-examination, Attorney Capdeville questioned Agent Tokarz about the DEA's ability to alter videos taken in this matter, including government's exhibit 74.[55] Agent Tokarz initially testified that footage could not be added to any of the videos.[56] He later testified that his written summary of the March 1, 2003 surveillance included the following statement: "Additional footage was later added to this tape by SA Rambo at a separate date and time."[57] Agent Tokarz then explained that "on that videotape [i.e., government's exhibit 74], there was footage added at a separate date from a *different incident. You just turn the recorder on and keep recording*. But it's not footage related to this."[58] Thereafter, the District Court, Attorney Capdeville and Agent Tokarz engaged in the following colloquy:

> Q.    So if I'm understanding your testimony, you're saying that this video that we saw was not altered in any way?
>
> A.    No.
>
> Q.    And you're saying that [it] is not capable of being altered?
>
>  . . .
>
> THE COURT: What is capable of being altered?  A particular frame of it, or –
>
> MR. CAPDEVILLE: The tape.  One of the, the reports in effect suggests that –
>
> THE COURT: Well, no, no.  "Altered" has several meanings, so I have to be clear what you mean by "altered."

---

[54]    *Id*. at 117:9-22.

[55]    July 21, 2005 Trial Tr. at 47:17-22, 51:1-6 [DE 877].

[56]    *Id*. at 60:1-4, 63:9-14.

[57]    *Id*. 63:24-25, 64:1.

[58]    *Id*. at 64:16-19 (emphasis added).

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 28

MR. CAPDEVILLE:  All right.  It means, in my questioning, either adding footage or taking footage away.  And I believe the witness said it could not be done.

THE WITNESS: You mean related to this, what you're seeing there?

Mr. Capdeville:  To any tape.

THE COURT:  No, no, that's not –

MR. CAPDEVILLE:  Let's go to this tape right here.

THE COURT:  This footage, as I understand it, that's already, that's part of the recording, can be added to a recording of this kind.  But it doesn't alter what is already recorded in a frame.

MR. CAPDEVILLE:  I understand what you're saying.  All right.  Thank you.

THE COURT:  Alteration would suggest that the picture one would normally see would be altered in some way, so as to change the name, changed the face of Mr. Capdeville to Judge Giles.  That's the kind of alteration that is possible, in the phrase "alteration."

MR. CAPDEVILLE:  Very well.

THE COURT:  Adding to something or splicing it is something that may be capable, as I understand the testimony, on this particular kind of recording.  And you may ask him if it was.

MR. CAPDEVILLE:  Thank you.  Well, I am not going to ask that.  Thank you.[59]

As the above colloquy demonstrates, Attorney Capdeville in fact attempted to develop an argument regarding alterations to the video evidence, but the Court's questions undermined the effectiveness of the argument, and Attorney Capdeville moved on.  As such, petitioner cannot succeed in his ineffective assistance of counsel assertion on this basis, in as much as there is no duty, under relevant standards of conduct, to continue to pursue this line of questioning that the

---

[59]    *Id*. at 65:22-25, 66, 67:1-14 (alteration added).

Court would not permit.

The Court RECOMMENDS petitioner's claim of ineffective assistance of counsel in ground four be DENIED.

## D.    Denial of Sixth Amendment Right to Counsel (Ground Six)

While couched as an ineffective assistance of counsel, petitioner's sixth ground is a Sixth Amendment denial of access to counsel claim.  The Third Circuit decided this claim adversely to petitioner on direct appeal.  *Fleming*, 287 Fed. Appx. at 155.[60]  Petitioner thus cannot relitigate this claim under section 2255.  *See United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (explaining a habeas motion is not the appropriate forum to re-litigate issues previously addressed on direct appeal); *United States v. Michaud*, 925 F.2d 37, 41 (1st Cir. 1991) ("[I]ssues decided on direct appeal may not be relitigated under a different label on collateral review.") (citation omitted); *United States v. Johnson*, 105 F.3d 670 (table), 1997 U.S. App. LEXIS 69, at *4-5 (10th Cir. Jan. 2, 1997) ("We cannot again review this claim simply because it has been recast in the clothing of an ineffective assistance of counsel claim.").

The Court RECOMMENDS petitioner's claim in ground six be DENIED.

## E.    Sentencing counsel's failure to challenge the District Court's drug quantity determination at sentencing (Ground Seven)

Petitioner argues the District Court "summarily accepted" the factual findings of the Presentence Investigation Report ("PSR") without making any "individualized findings that the alleged drug quantities where [sic] *actually* possessed or distributed by Petitioner . . . ."  Pet'r's Mem. at 42 (emphasis in original).  Thus, claims petitioner, his sentencing counsel, John H.

---

[60]     On appeal, Hendricks argued that "he was denied access to counsel because he was held in Puerto Rico during the trial."  *Fleming*, 287 Fed. Appx. at 152.  While the Third Circuit's opinion "focus[ed] on the Confrontation Clause issue that Hendricks raise[d] in his briefs" and did not provide any discussion of Hendricks's remaining claims raised on appeal, the Third Circuit expressly noted that it "carefully considered all of the other claims and conclude[d] that none have merit."  *Id.* at 155 (alterations added).

Benham, Esq., rendered ineffective assistance by failing to object on this ground.

At the outset, the Court dispenses with petitioner's mistaken belief that a participant in a drug conspiracy is responsible only for that quantity of drugs which he personally possessed and/or distributed. In a federal drug conspiracy charge, there are two relevant drug quantities. The first is the amount of drugs involved in the conspiracy as a whole, which determines the statutory maximum. This finding is made by the jury. *United States v. Phillips*, 349 F.3d 138, 142-43 (3d Cir. 2003) (explaining in drug conspiracy cases, the jury must find, beyond a reasonable doubt, the drug quantity attributable "to the conspiracy as a whole, and not the . . . quantity attributable to each co-conspirator"), *vacated and remanded on other grounds sub nom*, *Barbour v. United States*, 543 U.S. 1102 (2005).

The second relevant drug quantity is the one attributable to a defendant for purposes of determining his guideline sentencing range, which cannot exceed the applicable statutory maximum. *Id.* This finding is made by the court. When calculating a defendant's guideline sentence, the court may consider as relevant conduct "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). Additionally, "in the case of a jointly undertaken criminal activity" such as a conspiracy, the court may consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" if those acts and omissions "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B). As a result, when calculating the guideline sentence for a defendant convicted of conspiracy, the court may hold a defendant accountable for the quantity handled by the entire conspiracy, not just the quantity of drugs the defendant handled individually, as demonstrated by

a preponderance of the evidence. *See, e.g.*, *United States v. Barndt*, 533 Fed. Appx. 92, 97 (3d Cir. 2013) (explaining "because [defendant] was convicted of conspiracy, he was liable not just for the quantity of drugs he handled, but the quantity handled by the entire conspiracy").

Here, the Court did not commit any error when sentencing petitioner. The Court correctly calculated petitioner's maximum and minimum statutory sentence. The jury unanimously found beyond a reasonable doubt that the drug conspiracy offense that petitioner committed involved five kilograms or more of cocaine. Gov't Resp., Ex. A, Special Verdict [DE 1280-2]. Thus, based solely on the jury's finding that the conspiracy involved five or more kilograms of cocaine, petitioner faced a statutory minimum sentence of ten years' imprisonment and a statutory maximum of life imprisonment. 21 U.S.C. §§ 841(b) (1)(A), 846; *see* Sentencing Tr. at 5:12-21 [DE 1135].

Moreover, prior to imposing sentence, the Court entertained objections to the PSR. *See United States v. Miele*, 989 F.2d 659, 665 (3d Cir. 1993) (stating "under Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure, if a defendant disputes a fact included in the presentence investigation report, the sentencing court must either resolve that dispute or state that it will not rely on the disputed fact"). Despite petitioner's statement to the contrary, Attorney Benham specifically objected to the drug quantity found in the PSR, challenging in particular the following paragraph:

> Testimony and evidence introduced at trial established that over the course of the conspiracy, the drug organization imported and distributed more than five (5) kilograms of cocaine. Specifically, Ishmael Bratwaite [sic] testified that between 2000 and 2001, he traveled with Hendricks to St. Maarten and picked up one hundred and fifty (150) kilograms of cocaine which were delivered by boat to St. Croix and St. Thomas. Brathwaite also testified that prior to the trip to pick up 150 kilograms, he and Hendricks traveled by boat from St. Thomas to Tortola and back for the purpose of picking up fifty (50) kilograms. Anthony Ottley testified that he purchased six (6) kilograms of cocaine in March 2003. Testimony from

> law enforcement, along with video, audio and physical evidence, established that Hector Rivera, while working under the direction of law enforcement, purchased four (4) kilograms of cocaine; one kilogram on October 10, 2002 and three kilograms on March 2, 2003.

PSR at 21 ¶ 24.  The Court and Attorney Benham engaged in the following colloquy:

> THE COURT: There is, in the Presentence Investigation Report, a recitation of evidence and amounts that would bring the defendant's responsibility in excess of 200 kilograms of cocaine, specifically paragraph 24.
>
> . . .
>
> MR. BENHAM: we dispute the conclusion that the Court seems to be drawing from this paragraph in the report, that he is responsible for the drug weights that are stated in the Presentence Investigation Report in paragraph 24.
>
> …
>
> We do take exception to that, that it is the jury's special verdict here. The jury was submitted a special verdict form to make these determinations and it is not up to the probation officer, with all due respect, to summarize and say what the testimony established at trial. We believe that what was established at trial is best determined by reviewing the verdict, and the special verdict that was returned by the jury.
>
> THE COURT: All right.
>
> MR. BENHAM: So our exception to paragraph 24 of the Presentence Investigation would be that the drug weight cannot be determined by the Probation Department's summary and conclusions that are drawn from their own review of the testimony, but that the Court should look at what the jury actually did in this case, in order to determine the drug weights. And I believe we have accurately summarized what the verdict and special verdict established at trial in the memorandum we submitted to the Court.
>
> THE COURT: All right.
>
> …
>
> Mr. Hendricks, have you, have you, yourself, reviewed the Presentence Investigation Report?
>
> THE DEFENDANT: Yes, Your Honor.

> THE COURT: And have you discussed it with present counsel?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Are there any additions or corrections which you believe should be made in the report, other than what counsel has argued here?
>
> THE DEFENDANT: Not that I can recall, any additional issues.
>
> THE COURT: Thank you, sir.[61]

Next, the Court heard argument from Assistant United States Attorney Gregory Lisa:

> THE COURT: Now, what is your argument with respect to the evidence in the case and Mr. Hendricks' responsibility for any drug amount?
>
> MR. LISA: Your Honor – I'm sorry.
>
> THE COURT: The jury has determined that he is responsible for five kilograms or more. And what's the "or more"?
>
> . . .
>
> MR. LISA:  I think that the trial record well establishes, maybe even beyond a reasonable doubt, but certainly beyond a preponderance, [an] amount of well beyond 200 kilograms.[62]

The Court confirmed with Attorney Lisa that the evidence regarding the quantity of cocaine trafficked was in the form of circumstantial evidence only, and in particular witness testimony by Mr. Brathwaite, Mr. Ottley, Mr. Schoenbohm, Mr. Peltier, Mr. Clarke and law enforcement testimony regarding Mr. Rivera's purchases of cocaine.[63]   The Court then entertained further argument from Attorney Benham:

> MR. BENHAM: . . . . The, as the Court pointed out in his colloquy with the government, all of the evidence that they [i.e., the government] rely on to

---

[61]     Sentencing Tr. at 6:12-15, 8:11-15, 10:1-21, 24-25, 11:1-11 [DE 1135].

[62]     *Id*. at 19:2-9, 20:14-16.

[63]     *Id*. at 19:11-25, 20:1-9, 21:13-25, 22, 23:1-13.

establish the drug weights here is solely the anecdotal evidence of these witnesses stating, "I carried 18 kilograms," "I carried 5 kilograms," "I got 3 kilograms." None of that evidence was presented in physical form to the jury.

…

And now we're in the range of speculation, to determine what did the jury exactly determine. And our point is, Your Honor, the only thing that we can rely on at this point is what the jury returned in their special verdict. They said over five, and I don't think now we can just speculate upwards and say, well, this witness testified to this many kilograms, this witness testified to that many kilograms.

…

So our position would be that you are bound, since the special verdict was submitted to the jury, only finding the minimum amounts required by the statute. If the Court and the government had wanted to have more specific findings from the jury, it would have been simple to submit a very – another verdict form, which it would have said, "If you find over five kilograms, state how many more" – or "state what amount you do find the defendant was responsible for."

They didn't make that finding. The only finding they made was over five. And to go over five, this Court is engaging in speculation that cannot be supported, no matter what standard of proof is applied, no matter what burden, because as established – it can't be established either beyond a reasonable doubt or by the preponderance.

. . .

[A]lthough the Third Circuit may have stated that the Court can engage in some judicial fact-finding at the sentencing stage, the Court can't engage, cannot engage in speculation as to what the drug weights were. In this instance, the special verdict was returned by the jury. If the government or the Court had wanted a more specific finding to be made by the jury, a more specific special verdict form could have been submitted to the jury, and they could have returned a more – may or may not have returned a verdict with more specific drug weights stated. But here they simply stated the statutory minimum, and I believe we're bound by that finding. And the Court cannot, by a preponderance, find that they really meant some greater amount.

THE COURT: I understand your argument.[64]

The Court ultimately disagreed with Attorney Benham's argument, finding by a

---

[64] *Id.* at 26:16-21, 27:16-24, 28:8-23, 30:24-25, 31:1-14.

preponderance of the evidence that petitioner was responsible for 150 kilograms or more of

cocaine being trafficked.[65]   In so finding, the Court discussed in detail the testimony presented at

trial, noting in particular that

> [t]he jury convicted the defendant of the drug conspiracy charged in the
> indictment, which alleged large-scale trafficking in cocaine. Mr. Brathwaite's
> testimony is consistent with that trafficking. His testimony, the Court finds, was
> likely believed by the jury in terms of his description of the method of
> concealment of cocaine and modes of transportation of the cocaine. And it is
> likely that the jury believed, as the Court finds, that the amounts of cocaine
> trafficked were those which Mr. Brathwaite stated they were. Mr. Brathwaite was
> an experienced drug dealer, and an experienced compatriot of Mr. Hendricks.[66]

The Court then discussed the testimony of the remaining witnesses.  The Court's factual findings

regarding drug quantity indicate the drug quantity finding in the PSR was supported by an

adequate evidentiary basis.   *See Araromi v. United States*, 2014 U.S. Dist. LEXIS 56891, at *64

(W.D. Tex. Apr. 23, 2014) (stating "[t]here are many ways in which drug quantity findings in a

presentence investigation report may be supported by an adequate evidentiary basis . .

.includ[ing], the testimony or sworn statements of law enforcement officers[] and the statements

and admissions of coconspirators, codefendants, or confidential sources") (alterations added;

footnotes omitted); *cf. United States v. Gibbs*, 190 F.3d 188, 204 (3d Cir. 1999) (recognizing that

courts have estimated drug quantities based on testimony by a co-defendant).

In sum, the Court properly identified and explained the evidence it relied upon in

reaching its drug quantity conclusion.  Moreover, Attorney Benham specifically objected to the

drug quantity listed in the PSR.  Accordingly, petitioner's seventh ineffective assistance claim is

meritless.

---

[65]      *Id*. at 33:3-5.

[66]      *Id*. at 33:24-25, 34:1-11.

The Court RECOMMENDS petitioner's claim of ineffective assistance of counsel in ground seven be DENIED.

## IV.    REQUEST FOR AN EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing. Pet'r's Mem. at 25. In a section 2255 motion, if a petitioner alleges facts that, if true, would entitle him to relief, a district court should order an evidentiary hearing. *Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989). A district court is not required to hold a hearing, however, if a petitioner's claims are affirmatively contradicted by the record or are clearly frivolous. *Id.*; *see also* 28 U.S.C. § 2255(b) (establishing an exception to the evidentiary hearing requirement where "the files and records of the case conclusively show that the prisoner is entitled to no relief"). The question of whether to order an evidentiary hearing "is committed to the sound discretion of the district court." *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989). Here, the record in this case conclusively shows that petitioner is not entitled to relief sought in his section 2255 motion. *See Padilla-Castro*, 426 Fed. Appx. at 63. Therefore, petitioner's request for an evidentiary hearing should be denied.

## V.    CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's Motion to Vacate, Set Aside or Correct Sentence [DE 1237] be DENIED without an evidentiary hearing. It is further recommended that a certificate of appealability be DENIED.[67]

---

[67]    When a district court issues a final order on a section 2255 motion, it must make a determination whether it will permit a certificate of appealability. 3d Cir. L.A.R. 22.2; FED. R. APP. P. 22(b)(1). A district court will issue a certificate of appealability only upon a finding of a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (stating a certificate of appealability shall issue only if the petitioner establishes "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Here, the record fails to show a violation of petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

*Hendricks v. USA*
Criminal No. 2004-05
Civil No. 2010-11
Page 37

Any objections to this Report and Recommendation must be filed in writing within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time shall bar the aggrieved party from attacking such Report and Recommendation before the assigned District Court Judge. 28 U.S.C. § 636(b)(1); LRCi 72.3.


**Dated:**  September 1, 2015                                    S\_____

**RUTH MILLER**
United States Magistrate Judge